LUDTKE et al. v. SMITH.    (No. 7160.)

(Court of Civil Appeals of Texas. Galveston. April 7, 1916. On Motion for Rehearing, April 27, 1916.)

1. ADVERSE POSSESSION ☞10 — ACQUIRED AFTER JUDGMENT QUIETING TITLE.

After the termination of an action quieting title and enjoining trespass by defendant, he may nevertheless acquire adverse possession by entering and holding possession for the statutory time.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 58–64; Dec. Dig. ☞10.]

2. APPEAL AND ERROR ☞719(1)—NECESSITY OF OBJECTIONS AND ASSIGNMENTS OF ERROR.

A court of civil appeals has no authority to revise a judgment of the trial court, except on matters distinctly specified by assignments of error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2968, 2972, 2980, 2981, 3490; Dec. Dig. ☞719(1).]

3. ADVERSE POSSESSION ☞27 — EVIDENCE —SUFFICIENCY.

Where the evidence failed to disclose a sufficient description of that portion of land inclosed, or that portion adversely used for pigpens or slaughterhouses, to enable the jury to segregate such tracts from a larger tract, the verdict for plaintiff *held* to be not against the weight of the evidence.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 121, 122, 652, 664, 684; Dec. Dig. ☞27.]

On Motion for Rehearing.

4. APPEAL AND ERROR ☞854(2) — REVIEW — CORRECT DECISION ON WRONG THEORY.

A proper judgment will not be disturbed merely because based on a wrong conclusion of law.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3408–3410; Dec. Dig. ☞ 854(2).]

5. ADVERSE POSSESSION ☞85(3)—EVIDENCE.

Evidence examined, and *held* to show that plaintiff's possession was by permission, and that there had been no repudiation of tenancy sufficient to start the statute running, and as a matter of law no adverse possession was shown.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 503, 688–690; Dec. Dig. ☞85(3).]

Appeal from District Court, Harris County; Wm. Masterson, Judge.

Action to try title by G. C. Smith against Rosina Ludtke and others. Judgment for plaintiff, and defendants appeal. Affirmed on rehearing.

Stewarts, R. W. Houk, D. E. Simmons, and W. F. Tarver, all of Houston, for appellants. Hunt, Myer & Teagle, of Houston, for appellee.

McMEANS, J. This is an action of trespass to try title, brought by G. C. Smith against Rosina Ludtke, the widow, and the other defendants, the children and heirs at law of August Ludtke, to recover the title and possession of 15 acres out of lot 16 and 10 acres out of lot 15 of the Harris & Wilson two-league grant in Harris county. Defendants relied upon the defense of limitation under the 10-year statute, which they pleaded. A trial before a jury resulted in a verdict and judgment for plaintiffs, from which the defendants have appealed. The court charged the jury, in part, as follows:

"With reference to the 10-acre tract, the record evidence introduced before you shows that by reason of a former judgment and injunction proceedings thereunder, the latter of which is still in force, the defendants cannot claim title thereto by limitation, and you will consider this case only with reference to the tract of 15 acres."

This charge was duly excepted to, and is assailed by appellants' first assignment of error. The defendants requested the court to give their special charge No. 1, which was refused, and the second assignment is based upon the refusal of the court to give it to the jury, viz.:

"If you believe from the evidence that the defendants and those under whom they claim had and held peaceable and adverse possession (as those terms have been defined in the main charge of the court) of a tract of 10 acres of the lower part of lot 15, being the same property particularly described in the plaintiffs' petition herein, and in controversy herein, cultivating, using, or enjoying the same for a period of more than 10 years preceding the institution of this suit, then you will return your verdict in favor of the defendants for the said 10-acre tract."

There was evidence sufficient to raise the issue of title in defendants under the 10-year statute of limitations, and the issue should have been submitted to the jury, unless the court correctly ruled that this defense was not available to them by reason of the rendition of a former judgment and the injunction proceedings thereunder.

[1] The history of the former judgment and injunction proceedings referred to, as we gather it from the briefs of the parties, is this: On August 22, 1871, B. C. Franklin and Jas. T. D. Wilson brought suit against August Ludtke for partition of lot 15, and partition was ordered. In the partition the eastern half of lot 15 was decreed to Franklin and Wilson, and the western half to Ludtke. On December 3, 1877, Wilson, alleging that Ludtke was trespassing upon that parcel of land decreed to Franklin and Wilson in the partition suit, brought suit against Ludtke for said parcel, and recovered judgment therefor, and the court issued a perpetual injunction, restraining Ludtke from again trespassing upon that portion of land. In November, 1897, Wilson again sued Ludtke for the recovery of the parcel set aside to Franklin and Wilson in the former decree, and recovered a judgment; and under this judgment a writ of possession was issued in favor of Wilson, and executed by the sheriff of Harris county on August 13, 1898, whereby Wilson was placed in possession of the land and the defendants dispossessed. In this last suit Ludtke was again enjoined from ever again trespassing upon the land. Some time prior to this last judgment Glenn M. Harris brought suit against Wilson for an undivided half interest in lot 15, making Ludtke a party defendant. In this suit Ludtke recovered judgment for the western half, which had been partitioned to him in the suit of Franklin and Wilson against Ludtke, and Harris finally recovered judgment against Wilson for 10 acres of the eastern half, which is the land in controversy. Plaintiff Smith deraigned title to the 10 acres by purchase from Glenn M. Harris. Evidence was introduced on the trial tending to prove, and sufficient to raise the issue of, title of the Ludtkes to the 10 acres by actual adverse possession under the 10-year statute begun after the rendition of judgment against August Ludtke in 1898, and after the granting of the injunction and continuing up to the filing of this suit in 1913. In 1909 Ludtke was cited for contempt for violating the injunction by again entering upon the land, but no hearing was ever had thereon and no orders entered therein. We may assume, for the purpose of this opinion, that as Harris was the joint owner with Wilson of the eastern half of lot 15, the judgment recovered by Wilson against Ludtke therefor inured to the benefit of Harris as a joint tenant, and also inured to the benefit of the plaintiff Smith by reason of his purchase from Harris. The question then remaining to be determined is, Did the recovery of the land by Wilson from Ludtke in the various suits mentioned, and the issuance of the injunctions referred to, operate to prevent the running of limitations in favor of Ludtke upon his thereafter entering into the actual possession of the land notwithstanding the judgments and injunctions? We think we must answer this question in the negative. It has often been held that a vendor, by executed conveyance, who remains in possession of land, claiming it as his own, without notice other than possession, may acquire against his vendee a title by limitation. Smith v. Montes, 11 Tex. 24; Harn v. Smith, 79 Tex. 310, 15 S. W. 240, 23 Am. St. Rep. 340; T. & P. Ry. Co. v. Maynard, 51 S. W. 255. In Pendleton v. McMains, 32 Tex. Civ. App. 575, 75 S. W. 349, in which a writ of error was denied, it is held by the Court of Civil Appeals of the Fourth District that adverse possession of land for 10 years establishes a title against one whose title is derived from a judgment, though the adverse possessor be the defendant in such judgment. In writing the opinion of the court Judge Fly said:

"More than 13 years had elapsed after the rendition of the judgment before this suit was instituted, and during all those years defendants in error had been in possession of the land, and claiming title to it against the world. There is no peculiar sacredness in a title to land obtained through a judgment that lifts it out of the scope and purview of statutes of limitation, and, if the possession be adverse for 10 years, whether it be by the defendant in the judgment or any cne else, it will perfect a title."

This language is quoted with approval by our Supreme Court in Thomson v. Weisman, 98 Tex. 174, 82 S. W. 503. It is clear, then, it seems to us, that notwithstanding the judgment against him for the 10 acres in question, if August Ludtke thereafter re-entered into the actual possession of the tract, claiming it as his own, and that he and those who claim under him cultivated, used, or enjoyed the same for the full period of 10 years after the rendition of the last judgment in favor of Wilson and against him, such possession ripened into a title which

could be successfully interposed against plaintiff in this suit. It does not appear that the injunction was ever enforced, or that through it August Ludtke, or those claiming through him, were ever dispossessed. We think, in view of this fact, that the mere existence of a judgment granting an injunction no more prevented the possession of the Ludtkes from being adverse than did the judgment against him for the title and possession. And it makes no difference that in 1909 Ludtke was cited for contempt for disobeying the injunction, since no further action was taken in that matter, nor any order entered therein. Nor did the injunction have the effect of placing the land in custodia legis, as in the case of McAllen v. Crafts, 139 S. W. 41, where the possession asserted as adverse was taken and held under a writ of sequestration. We think, therefore, that the court should have submitted the defense of 10-year limitation pleaded by the defendants, and that the failure to do so was error which requires a reversal of its judgment.

[2] The third assignment complains that the court erred in giving the plaintiffs' special charge No. 3. Thus far the discussion has been in reference to the 10 acres out of lot 15. The special charge was asked with reference to the 15 acres out of lot 16. No objection was made to the giving of the special charge in the defendants' motion for a new trial, nor was the giving of it assigned as error, either in the motion for a new trial or any assignment of error filed in the court below. This court has no authority to revise a judgment of the trial court except on a matter distinctly specified by an assignment of error. Deutschman v. Ryan, 148 S. W. 1140. The assignment cannot be considered.

[3] The fourth assignment complains that the verdict of the jury as to the 15 acres out of lot 16 is contrary to the evidence, in that the undisputed evidence shows that the defendants had adversely occupied, used, and enjoyed certain parts of the 15-acre tract for more than 10 years before the filing of this suit, by a pigpen and slaughterhouses and substantial inclosures, and that they were entitled at least to the parts so actually inclosed by such improvements. The evidence fails to disclose any sufficient description of the portion of the tract adversely used for a pigpen, slaughterhouses, or that portion claimed to have been inclosed, to enable the jury to segregate such portions from the larger tract. We overrule the assignment. The judgment in favor of the plaintiff for the 15-acre tract is affirmed, and because of the error indicated, the judgment in favor of plaintiff for the 10-acre tract is reversed, and the cause remanded for further proceedings in accordance herewith.

Affirmed in part. Reversed and remanded in part.

### On Motion for Rehearing.

[4] Upon further consideration we conclude that we were in error in holding that the evidence was sufficient to raise the issue of title in defendants to the 10-acre tract under the 10-year statute of limitations, and in further holding that that issue should have been submitted to the jury. While we cannot agree with the learned trial judge in the view upon which he instructed a verdict as to this tract, we do believe that a peremptory instruction in favor of appellee was properly given. It has been often held that, where a judgment has been properly entered for a party, the fact that it is based upon a wrong conclusion of law is immaterial. As showing the ground upon which our conclusion is based that the evidence was insufficient to raise the issue, we here set out the most material parts of the testimony of the witnesses whose testimony was relied upon to prove it. W. F. Ludtke, witness for appellants, testified on direct examination:

"In 1903, in the spring, I fenced that 10-acre tract, just that way, and kept my cattle in it."

### On cross-examination he testified:

"I put that fence there about 1903. The fence I am speaking about is the 10-acre tract. I fenced that land for a man named D. P. Hubbard, and I told Hubbard, 'This is my father's land and my mother's land; we own this land.' He says, 'That is nothing here or there; fence it.' and I fenced it, and there has been nobody come around and asked for a nickel of rent at all, and we have been in possession of it ever since. I began to claim it for my own aside from any interest my father or mother claimed in there in about 1902. In 1902 I claimed the whole of it. I do not know who I claimed against. My father was living until 1908. As to the title to the 10-acre tract, I will say that we have been in possession of it, and I put a fence there. I also claimed that I fenced it and had been in possession of it for Mr. D. P. Hubbard, who was going to buy it from Mr. Harris. I told him at the time, I said, 'This is my father's property.' 'Well,' he said, 'you fence it, because I am not asking you whose land it is.' I told him I would fence it for so much money. I was not claiming any individual interest myself; my father was then claiming it. That was before my father's death. The other children were not claiming this 10-acre tract themselves. My father was still living when I fenced it in 1903. My father was claiming that land, and I told Mr. Hubbard of that fact. After I fenced this land I began claiming this land for myself at this time, which might have been a month or so after. He told me (meaning Hubbard), 'I am not able to pay you for doing the work until after getting through with my troubles, and you use the land,' and I have been using it ever since. I went into possession under that sort of arrangement. My father was still claiming that land when I went into possession. I might have been claiming against my father, but my father never told me to get off of it. Mr. Hubbard also told me to use it and lets me use it yet. I did not buy any of that property down there. I did not buy any of it from my father. I did not buy any of it from Mr. Hubbard. I just thought Mr. Hubbard was good enough to let me stay in possession of that property, and that it would be all right. There is no use to buy property if you do not have to pay for it. I made this arrangement with Mr. Hubbard in the early part of 1903. The way I fix that date is that I had just moved down there

to the old place on this piece of land here, right about in here (Royal addition); that is the reason I got the date fixed down. It was just about the date I got married, maybe about a year after I got married. As to this arrangement or agreement with Mr. Hubbard, he came down there and a man named Sullivan. I guess he was a real estate man—I would know him if I saw him—and he said, 'Well, Mr. Hubbard is going to buy that 10 acres of ground here in the bend; do you know where it is?' And I said, 'Yes, sir; I know where it is.' 'A man by the name of Hanna surveyed that land; it belonged to my father and mother.' Mr. Hubbard said, 'I do not care who it belongs to. I am giving $10,-000 for it, and what will you fence it for?' And I put my price and told him I would fence it for so much, and I fenced it, and then I went back to Mr. Hubbard and said, 'I would like to get my money,' and he said, 'No; I cannot pay, but wait and stay in possession of the land until I come back from the north, and I will pay you for the whole and straighten up the matter.' He came back, and I sued him for the money and got my money all right, and I stayed in possession of the land and used it and kept my cattle in there, and after that I used it straight on. Mr. Hubbard never did come back to collect rent from me, and nobody else asked me for any rent since that time. My father did not quitclaim that property just as soon as I went into possession of it for Mr. Hubbard. I have a quitclaim from my father to me and Pete Ludtke. As to whether my father quitclaimed that land after I went into possession for Mr. Hubbard, in those days he was feeble and could not get around hardly at all. He was very old when he died. I told my father about getting into possession for Mr. Hubbard, and he said I should not have fenced it. He said, 'What made me fence it?' And I said I might as well take the money as anybody else. He (meaning August Ludtke) did not permit me to use it then; I used it on my hardness. My father did not use it at the same time. Mr. Hubbard did not tell me to stay off, he let me come in, and I am there yet. I stayed in possession of it, and I used it for myself and my father and you too, and Mr. Hubbard or anybody else."

On redirect examination the witness W. F. Ludtke testified:

"Speaking of this map and by its identifications, the fence that I built in 1903 for D. P. Hubbard is shown on this map by the letter 'A.'"

E. F. Westergreen testified:

"I know that this 10-acre tract has been fenced. It was fenced in 1903, and part of it is there now, part of the fence is there now—only it is down."

On cross-examination the witness Westergreen testified:

"I said that this 10-acre tract down there was fenced about 1903. W. F. Ludtke fenced it; he got the contract, I was told, from this fellow Herbert (meaning Hubbard). He put the fence up there for Mr. Herbert."

P. P. Ludtke testified:

"The fence A, being a fence running north and south down to the bend in the bayou, was placed there in 1903. It stayed there about 6 or 7 years. W. F. Ludtke put that fence there."

On cross-examination he testified:

"No, sir; my father did not put a fence on this 10 acres; my brother, W. F. Ludtke, did. He did it in 1903 for a man by the name of Hubbard. I never did see the man in my life. I know only what my brother told me. I know that W. F. Ludtke fenced the land for Hubbard. He told me he went into possession under Mr.

Hubbard. Yes, sir; he told me all about it. This 10 acres was fenced up for 7 or 8 years."

[5] It will be seen from the testimony of said witnesses that the only actual possession held by any of the Ludtkes was under and by permission of Hubbard, and there was no such repudiation of tenancy under Hubbard by W. F. Ludtke or of any of the other appellants proved as was sufficient to start the statute to running in their favor. Certain detached and loose expressions of these witnesses, construed by themselves and not in connection with their testimony above set out, might indicate an actual adverse possession and claim by them, but their testimony, when construed as a whole, shows that the land was fenced by W. F. Ludtke for Hubbard, and afterwards occupied by him with Hubbard's consent, and not adversely to Hubbard or any one else. We think, therefore, that the court was authorized to peremptorily instruct a verdict as to the 10 acres upon the view that adverse possession by the Ludtkes was not shown, and that the judgment against them, although based upon an erroneous conclusion, should not be disturbed.

Affirmed.